McKITRICK et al. v. McKITRICK.

(Court of Appeals of District of Columbia. Submitted October 8, 1919. Decided November 3, 1919.)

No. 3235.

DIVORCE 129(1, 12, 16)—EVIDENCE OF ADULTERY; CLEAR PROOF REQUIRED; SUSPICIOUS CIRCUMSTANCES.

In view of unreasonableness of husband's statement, evidence *held* insufficient to sustain a finding of adultery by wife, which must be established by evidence clear and satisfactory, and will not be presumed from suspicious circumstances.

Appeal from the Supreme Court of the District of Columbia.

Divorce suit by John W. McKitrick against Katherine T. McKitrick; James G. Duncan being joined as corespondent. From a decree granting plaintiff an absolute divorce on the ground of adultery, defendants appeal. Reversed.

S. D. Truitt, Irving Williamson, and N. C. Turnage, all of Washington, D. C., for appellants.

J. H. Ralston, S. McComas Hawken, and George F. Havell, all of Washington, D. C., for appellee.

ROBB, Associate Justice. The parties were married in 1904. Appellant had been married before, and had one child by that marriage, a daughter Catherine, then four years of age, who became and continued to be a member of the McKitrick household until the separation of the parties in September of 1917. According to appellee's testimony, at and for some time prior to the separation, he was the proprietor of a small lunchroom and store at the Soldiers' Home. On the 6th of September, 1917, Frank C. Gass, who had been a frequenter of the McKitrick home for some time, and who married Mrs. McKitrick's daughter Catherine in September of 1918, gave appellee to understand that the corespondent, Duncan, also was a frequenter of the house, and that improper relations had taken place between him and Mrs. McKitrick. Appellee occupied the same room with his wife that night and kissed her good-bye as usual the next morning. During the day she went to the lunchroom and, according to appellee's testimony, made "a confession that Duncan had been in his house; * * * that he got this information from his son-in-law, Frank Gass, and Catherine Gass, her daughter. Just as soon as he got this information he never went back to the house." Later, under cross-examination, the witness testified that several days after he had left his wife she called at his place of business and admitted committing adultery with Duncan "in front of her child," a little girl then aged 10 or 11 years. The witness admitted that Mrs. McKitrick did not want Catherine to marry Gass, and that the marriage took place without the knowledge or consent of the mother; that he (McKitrick) supplied the girl with money and gave his written consent to the marriage, although Catherine was

under 18 years of age. The witness further admitted that Mrs. Mc-Kitrick had.reared her children as churchgoers.

Frank C. Gass, who was but 19 years old at the time of his marriage, testified for appellee that he commenced calling on Catherine in 1916 and was there very·frequently; that Mr. Duncan had dinner there every evening, and Mrs. McKitrick told witness not to inform Mr. McKitrick that Duncan had been at the house; that on several occasions Duncan would go upstairs, and sometimes Mrs. McKitrick also would go up. He admitted that Mrs. McKitrick objected to his marriage with her daughter Catherine, and that he did not inform McKitrick of his suspicions until just prior to his marriage. It further·appeared from the testimony of this witness that after his marriage he and his wife lived with Mrs. McKitrick for several weeks. Other witnesses testified for appellants that Gass had made statements to them concerning the relations of Duncan.and Mrs. McKitrick in direct contradiction of his testimony at the trial.

The daughter Catherine, on the stand for appellee, testified that Duncan always left the house between 8:30 and 8:45 p. m.; that upon one occasion Mr. McKitrick came while Duncan was upstairs, and that Duncan hid in a closet until McKitrick left the house; that her mother was downstairs on this occasion; "that her mother and Mr. Duncan always acted like a lady and gentleman should"; and that she saw no acts of familiarity between them.

In behalf of appellants Duncan testified that he worked for McKitrick for about a year, when he was discharged for some reason unknown to him. In the latter part of 1916 he was working at the garage at the Soldiers' Home, and, as the suppers there usually were cold, he often would go downtown for a warm supper. On one of these occasions he met Mrs. McKitrick, and an arrangement was made between them under which he was to take his suppers at the McKitrick home and pay Mrs. McKitrick $3 per week. Mrs. McKitrick then informed him that her husband objected to her taking boarders, but that later she would explain the matter to him. Witness would go direct to the McKitrick home from the garage, and "usually wash his face. when he got there." He further testified:

"That he [witness] did have some trouble with Mr. Gass, and that it was just after war was declared with Germany, and that he made a remark that did not exactly suit Mr. Gass' caliber, or something, and so he took offense."

The witness denied having any improper relations with Mrs. Mc-Kitrick.

The McKitrick maid testified that she had worked for Mrs. Mc-Kitrick for about 9 years, and was working for her when Duncan took his meals there; that one night, when Mr. Duncan was in the bath-room washing his hands for supper, she heard Mr. McKitrick down-stairs; that she told Duncan of McKitrick's presence, and advised him to hide in the closet, which he did; that Mrs. McKitrick took Duncan to board, because she needed the money, and witness had heard her say she was going to tell Mr. McKitrick about the matter. Witness was upstairs much of the time in the evening, and had never seen

anything out of the way in the relations of Duncan and Mrs. Mc-Kitrick.

Mrs. McKitrick denied emphatically that she ever made any statement to her husband indicating that she had been unfaithful to him. There were people in the lunchroom, and she admitted to him that she had done wrong in taking Duncan to board. She asked him to give her an opportunity to explain the matter fully, but he would not listen to her. It further appeared from the testimony that McKitrick was not prosperous, and that his wife was helping him in every way possible; that she did have serious objections to Catherine's marriage to Gass, and "that they all discussed the question of the marriage the night before the 6th, as she remembers."

The charge against this woman is the most serious that can be formulated against a wife. If true, it brands her for all time. While the seriousness of the charge ought not to be permitted to shield her, if guilty, guilt will not be presumed from suspicious circumstances, but must be established by evidence "clear and satisfactory." Glennan v. Glennan, 3 App. D. C. 334; Krous v. Krous, 41 App. D. C. 200. In the present case the evidence leaves no room for doubt that Mrs. McKitrick was a good wife and mother. In addition to the performance of her household duties, she purchased supplies for her husband's lunchroom, did cooking for it, and, in an unsuccessful moving picture venture, helped him by playing the piano. In short, she assisted her husband to the extent of her ability. He undoubtedly provided for her as well as he could, but they were in debt and their means limited. It was not unnatural, therefore, for her to have made such an arrangement with Duncan, though she unwisely withheld information of it from her husband. By not imparting this information to her husband she laid the foundation for the trouble which ensued. We are unable to credit the testimony of the husband, when he says that his wife, whom he states had brought up her children as churchgoers, confessed to committing adultery in the presence of one of them, a girl of 10 or 11 years. The statement is so unreasonable and so inconsistent with admitted facts that it must be rejected. As to the witness Gass, he stands in no better light, and, moreover, in his testimony he went no further than to voice a suspicion. It is not difficult to find an explanation and motive for the conduct of this witness toward one who admittedly was unwilling to receive him as her son-in-law.

The facts, then, are these: This woman, who had been a good wife and exemplary mother for 13 years, took this man to board without the knowledge or consent of her husband. He came to the house at supper time and left shortly thereafter. There were present, on these occasions, Mrs. McKitrick's two daughters, Gass, and the maid. No acts of familiarity were testified to by any one, and it is inconceivable, in the circumstances, that any real wrong was committed. Of course Mrs. McKitrick ought not to have taken this boarder without her husband's knowledge and consent, but that is not ground for a divorce. Viewing the case as a whole, we are clearly of opinion that the decree should be reversed; and it is so ordered.

Reversed, with costs, and cause remanded.